Filed 9/16/13  P. v. Rayford CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B244230 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA083080) |
| v. | |
| REGINALD LAMAR RAYFORD, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark S. Arnold, Judge.  Affirmed.

Alex Coolman, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, and Paul M. Roadarmel, Jr., Deputy Attorney General, for Plaintiff and Respondent.

**INTRODUCTION**

A jury found defendant and appellant Reginald Lamar Rayford guilty of second degree robbery and of attempted second degree robbery.  On appeal, he contends that the trial court failed, sua sponte, to instruct the jury on the lesser included offense of attempted grand theft to attempted second degree robbery.  He also contends that the trial court failed to hold a hearing on his "implied" *Marsden*[1] motion.  We disagree with both contentions and affirm the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

**I.       Factual background.**

On the evening of Friday, December 16, 2011, Ofelia Bravo and Maritza Reyes were working at Bates Fish Market, located on El Segundo Boulevard in Gardena.  Also working at that time were Song Ye Eun (the store's owner, also known as "Mama"), Craig Benbo, and Brandon Scott.  Jameel Wallace was the market's cashier, but he left earlier that day at 8:30 p.m.  Most sales occurred on Fridays, when the store took in $1,500 to $1,600.  Because the market had been robbed in the past, Mama changed the way in which money was put away.  Instead of storing all money in the cash register, money was kept in a bag or envelope behind a box underneath the register where salt and pepper and catsup were stored.

At about 10:45 p.m., Mama took all of the money to her office to count it.  While in her office, she heard a loud noise and someone say " 'Give me money.' "[2]  Bravo testified that she was heating water when the door to the market was thrown open.  A man wearing a black jacket and a black bandanna over his face pointed a gun at Bravo and then at Reyes and demanded that Bravo give him money.  Bravo identified defendant at trial as the man with a gun.

---

[1]       *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

[2]       During these events, Mama remained in her office.

A second, younger man, also wearing a bandanna over his face, came in. He jumped over the counter, yelled at Bravo to give him money or whatever she had, and, running his hands over her clothes and grabbing her buttocks, he took her cell phone and bus pass. The same man began to take Bravo to the back, but when he noticed that someone was in the bathroom, he pushed Bravo to the floor and tried to open the bathroom door. Defendant went directly to where the cash register was and pulled out "a box." Defendant's bandanna fell, revealing his face.[3] The two men then ran away.

Reyes testified she was washing her hands at the sink when she heard someone tell her coworker to give him money. Turning, Reyes saw a man, who she identified at trial as defendant, pointing a gun at her. Defendant was on the other side of the high counter, where customers would be. Another man had jumped over the counter to Bravo.[4] When defendant's bandanna slipped, Reyes saw his face. Defendant was in the workspace, about 13 feet from Reyes, when his bandanna slipped. The men never approached Reyes or asked anything from her. She never moved from the sink.

At about this time, officers conducted a traffic stop of a car driven by Wallace, the employee who had left work early that day. Inside the car were two blue bandannas and gloves. Reyes and Bravo identified Wallace at a field show-up.

City of Gardena Police Officer Raul Alarcon was also driving near the market that night when he saw two Black men running with their hands in the front pockets of their jackets or hoodies.[5] The men wore beanies and white and blue bandannas below their chins. When the men saw Alarcon's patrol car, they stopped running. Suspicious of the

---

[3] At the preliminary hearing, Bravo testified it was the younger man's bandanna that slipped to reveal his face.

[4] Contrary to Bravo, Reyes testified that the man who jumped over the counter came into the store first.

[5] Franklyn Ikemefuna, who lived near Bates Market, was getting something from his car when he saw two men coming from the direction of the strip mall in which the market was located. He heard an officer give a command to the two men, and then he heard the sound of something hard and with "definite weight" dropping.

3

men's behavior, Alarcon ordered them to stop. One man, Jonathan W., complied, but the other man ran. Nearby, officers recovered an unloaded gun, black sweatshirt, beanie, and two gloves. From a photographic six-pack, Alarcon identified defendant as the man who ran.

DNA swabs were obtained from some of the physical evidence. The samples from the gloves and hoodie were a mixture of two contributors, and the profile for the major contributor matched defendant's DNA profile. The sample from the beanie was a mixture of at least three contributors, and defendant was included as a possible contributor to the mixture.

## II.    Procedural background.

On August 3, 2012, a jury found defendant guilty of count 1, the second degree robbery of Bravo (Pen. Code, § 211),[6] and of count 2, the attempted second degree robbery of Reyes (§§ 211, 664). As to both counts, the jury found true gun use allegations (§ 12022.53, subd. (b)).

On September 7, 2012,[7] the trial court sentenced defendant, on count 1, to the upper term of five years plus a consecutive 10 years for the gun allegation. On count 2, the court sentenced him to a consecutive eight months plus three years four months for the gun allegation. Defendant's total sentence therefore was 19 years.

## DISCUSSION

## I.    There was insufficient evidence to warrant instructing the jury on the lesser included offense of attempted grand theft.

Defendant contends that the trial court prejudicially erred by failing to instruct the jury on attempted grand theft on count 2. We disagree.

"It is settled that, even in the absence of a request, a trial court must instruct on general principles of law that are commonly or closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case." (*People*

---

[6]    All further undesignated statutory references are to the Penal Code.

[7]    After a court trial on a prior strike allegation, the court found it not true.

4

*v. Montoya* (1994) 7 Cal.4th 1027, 1047; see also *People v. Moye* (2009) 47 Cal.4th 537, 548; *People v. Breverman* (1998) 19 Cal.4th 142, 154.)  Instructions on a lesser included offense must be given when there is substantial evidence from which the jury could conclude the defendant is guilty of only the lesser offense.  (*People v. Manriquez* (2005) 37 Cal.4th 547, 584; *People v. Cook* (2006) 39 Cal.4th 566, 596.)  Substantial evidence is evidence from which a reasonable jury could conclude that the lesser offense, but not the greater, was committed.  (*Manriquez*, at p. 584; *People v. Barton* (1995) 12 Cal.4th 186, 201, fn. 8.)  In determining whether substantial evidence exists to support instruction on a lesser included offense, we do not evaluate the credibility of witnesses.  (*Manriquez*, at p. 585.)  We independently review whether the trial court erred by failing to instruct on a lesser included offense.  (*Id.* at p. 584; *People v. Oropeza* (2007) 151 Cal.App.4th 73, 78.)

Robbery is "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear."  (§ 211.)  Attempted grand theft (§ 487) is a lesser included offense of robbery, which includes the additional elements of a taking from the person or presence of another by force or fear.  (See *People v. DePriest* (2007) 42 Cal.4th 1, 50; *People v. Bordelon* (2008) 162 Cal.App.4th 1311, 1319; *People v. Gomez* (2008) 43 Cal.4th 249, 254 & fn. 2; *People v. Ramkeesoon* (1985) 39 Cal.3d 346, 351.)

Defendant argues that the trial court should have instructed on attempted grand theft because the jury could have concluded that defendant and his accomplice did not try to take property from Reyes's "immediate presence."  Property is within the victim's immediate presence for robbery purposes if it is " ' "so within his reach, inspection, observation or control, that he could, if not overcome by violence or prevented by fear, retain his possession of it." ' "  (*People v. Hayes* (1990) 52 Cal.3d 577, 626-627.)  The area must be one within which the victim " ' "could reasonably be expected to exercise some physical control over [his] property." ' "  (*Id.* at p. 627; see also *People v. Webster* (1991) 54 Cal.3d 411, 440.)  The "immediate presence" requirement of robbery describes

5

a spatial relationship, but it can include property located in another room of the house or building. (*People v. Gomez, supra,* 43 Cal.4th at pp. 257-258; *Hayes*, at p. 627.)

In *Hayes,* for example, the victim, the manager of a motel, was killed in one of the motel's rooms. (*People v. Hayes, supra,* 52 Cal.3d at pp. 628-629.) Items were stolen from the motel office, located 107 feet from where the victim was murdered. Under those circumstances, *Hayes* found that "a reasonable finder of fact could conclude either that the property was not so distant as to be beyond the victim's control and protection, or that it was too distant to be in the victim's immediate presence at the time the force was used." (*Id.* at p. 629.) Because the jury could have decided the immediate presence element either way, instructional error on that element was not harmless.

This case is very different from *Hayes.* The money or property defendant and his accomplice were attempting to take were in the same room as Reyes. The distance from Reyes to the cash register is unclear, but defendant concedes it was probably not more than about 15 feet from where Reyes stood at the sink. Although defendant asserts that the men did nothing "that was intended to force her to turn over property or do anything in particular," that is wrong. Defendant pointed a gun at Bravo and at Reyes, rendering Reyes immobile and unable to move from the sink. Had Reyes not been overcome by fear, she reasonably could be expected to exercise physical control over property located just feet away in the same room as she. (See, e.g., *People v. Webster, supra,* 54 Cal.3d at p. 440 [where taking occurred about a "mere quarter of a mile" from where victim's car was stolen, the car was in the "zone of immediate presence"].)

We therefore conclude that no substantial evidence established that defendant committed only attempted grand theft and not attempted second degree robbery. If defendant was guilty of anything, it was attempted second degree robbery.

## II.    The trial court did not fail to conduct a *Marsden* hearing.

Next, defendant contends that the trial court failed to conduct an inquiry into his "implied" *Marsden* motion. We reject this contention.

The need for a *Marsden* hearing arises when a defendant seeks to discharge his appointed counsel and substitute another and asserts inadequate representation. A

defendant must clearly indicate he wants substitute counsel to trigger a *Marsden* hearing. (*People v. Sanchez* (2011) 53 Cal.4th 80, 87-90 & fn. 3; see also *People v. Lucky* (1988) 45 Cal.3d 259, 281 fn. 8 ["We do not necessarily require a proper and formal legal motion, but at least some clear indication by defendant that he wants a substitute attorney"].) A trial court has no sua sponte duty to initiate a *Marsden* inquiry. (*People v. Leonard* (2000) 78 Cal.App.4th 776, 787.)

Defendant here did not clearly indicate he wanted substitute counsel. Rather, this is what occurred at the outset of the sentencing hearing:

"The defendant: . . . [¶] Sir, I'm requesting for retrial on account of the fact that my Sixth Amendment right, I believe, was very much violated. The people and everybody that was supposed to be involved with this case was not here. Initial property report Brandon Scott was not here. He was the main person who supposedly pointed me out.

"So I believe on my Sixth Amendment right here that I was entitled to a fair and impartial trial on that, the situation. I believe that is my right as well as my 14th as well. And under U.S. Constitution[,] subdivision 242's criminal offense to object and under code of law to deprive a person of rights protected by the Constitution of the law of the United States asserted under due process clause of the Constitution's 4th Amendment.

"So on behalf of that and the fact that these women came to court, witnesses that came to court and testified against me, talking about the mask falling off, nothing. There is nothing in my report to state that a description was given to the police. I don't have no reports in my police report of that. And [the] fact that, like I said, one of the main witnesses was not called.

"If the court granted me this, I would also like to exercise my *Faretta* rights if I'm granted this.

"The court: In granting your motion for a new trial?

"The defendant: Yes. I would like to prepare my own case.

"The court: Anything else?

"The defendant: That's about it. Thank you.

7

"The court: All right. I'm looking at Penal Code section 1181[.] [N]othing defendant has stated qualifies as grounds for granting a motion for new trial. So the motion is denied."

Defendant thus merely said he wanted a retrial and to represent himself. At no time did defendant express dissatisfaction with his appointed counsel, impliedly or otherwise, and he did not ask for substitute counsel. Nor did defense counsel indicate that her client had expressed any problems with her representation. This contrasts with *People v. Washington* (1994) 27 Cal.App.4th 940, 942-943. In that case, the defendant's ambiguous comments and his counsel's indication that the defendant was making a *Marsden* motion led the trial court to conclude that a *Marsden* hearing was necessary. Notably, *Washington* did not address whether the defendant's ambiguous statements were a clear indication he wanted substitute counsel; the court merely accepted the trial court's conclusion. (*Washington*, at p. 943, fn. 3.) Here, the trial court clearly concluded that defendant was asking for a new trial and not a *Marsden* hearing. Given the absence of a clear indication in the record that defendant was asking for such a hearing, that conclusion was proper.

Defendant did, however, raise an issue with certain events at trial, for example, that one of the employees present during the robbery did not testify. But defendant did not link this omission to his defense counsel as opposed to the prosecutor. Nor is it clear whether defendant was complaining that the witness should have been called or that the absence of the witness's testimony rendered the prosecutor's case inadequate to meet the burden of proof. In any event, to the extent defendant expressed a difference of opinion about trial tactics, this does not place a trial court under a duty to hold a *Marsden* hearing. (*People v. Lucky, supra,* 45 Cal.3d at p. 281.) We therefore find that defendant did not clearly indicate he wanted substitute counsel.

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


ALDRICH, J.


We concur:


KLEIN, P. J.


CROSKEY, J.

9